FILED
RICHARD W. NAGEL
CLERK OF COURT

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

10/4/2022

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The Cellular Telephone Assigned Call Number<br>(937) 672-0827 | )<br>)<br>) Case No. 3:22-mj-334<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference).

located in the _____ District of New Jersey, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☐ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 841 & 846 | Distribution and possession with intent to distribute controlled substances; Conspiracy to commit a Title 21 offense |

The application is based on these facts:

See attached affidavit of FBI Special Agent Eric McIntosh.

☑ Continued on the attached sheet.

☑ Delayed notice of  30  days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the warrant will also function as a pen register order. I thus certify that the information likely to be obtained is relevant to an ongoing criminal investigation conducted by the FBI. *See* 18 U.S.C. §§ 3122(b), 3123(b). *Kelly K. Rossi*

*Applicant's signature*

Eric McIntosh, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____
*(specify reliable electronic means)*.

Date: 10/4/2022

City and state: Dayton, Ohio

Caroline H. Gentry
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (937) 672-0827 | Case No. 3:22-mj-334 <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Eric McIntosh, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (937) 672-0827, with unknown listed subscriber(s) (the "Target Cell Phone"), whose service provider is Cellco Partnership d/b/a Verizon Wireless ("Verizon"), a wireless telephone service provider headquartered at 80 Washington Valley Road, Bedminster, NJ 07921. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since August of 2003. My primary duties as a Special Agent consist of investigating criminal enterprises, narcotics investigations, organized crime, and violent crimes to include unlawful possession

and possession with the intent to distribute controlled substances, as well as the associated conspiracies in violation of Title 21, United States Code, Sections 841, 843, and 846. I am familiar with federal firearms laws, and investigations into possession of a firearm by a convicted felon, possessing a firearm in furtherance of a drug trafficking crime and the associated violations of Title 18, United States Code, Sections 922 and 924. As part of my standard training to become a FBI Special Agent, I have received specialized training in the means and methods by which individuals and criminal enterprises conduct their illegal activities, as well as in the use of various investigative techniques used to uncover unlawful activities. Based upon my experience and training, I am familiar with the ways in which drug traffickers conduct their unlawful drug trafficking activity, including, but not limited to, their use of code words and numbers to conduct their transactions, their use of multiple telephones to conduct their illegal activities, their methods for concealing narcotics and narcotics proceeds and their use of firearms, violence, and threats of violence to protect their criminal organization. I have received further specialized training concerning the interception of wire communications.

4. I have participated in various types of electronic surveillance, including the interception of wire communications, in investigations of drug traffickers, money launderers, and violent criminal enterprises. I am also familiar with, and have personally participated in, other normal methods of investigating criminal enterprises, including, but not limited to, visual surveillance, the questioning of witnesses, the use of informants, undercover operations, the use of pen registers, including pen registers in the form of digital analyzers, and the use of location information from cell phones to identify drug traffickers and reveal their methods of operation.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show

merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, U.S.C., §§ 841 and 846 have been committed, are being committed, and will be committed by Dlaquan CANTRELL or unknown persons. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

7. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

8. The United States, including the FBI, is conducting a criminal investigation of Dlaquan CANTRELL ("CANTRELL") and other co-conspirators, both known and unknown, regarding possible violations of possession with intent to distribute controlled substances, distribution of controlled substances, and conspiracy to distribute controlled substances, in violation of Title 21, U.S.C., §§ 841(a)(1) and 846 (collectively referred to as the "Subject Offenses"). Specifically, the FBI Cincinnati and the Warren County Drug Task Force ("WCDTF") are investigating a Dayton area, poly-drug distribution network led by CANTRELL.

**A. Law enforcement learned that CANTRELL traffics drugs in the Dayton, OH area.**

9. From August 2022 to the present, agents and officers obtained information from a Confidential Informant ("CI")[1] with direct knowledge of CANTRELL's drug trafficking organization.

---

[1] The Confidential Informant has provided information to officers that has proven to be reliable and truthful. The CI is cooperating with law enforcement due to a pending criminal investigation into possible violations of state of Ohio drug laws.

The CI positively identified CANTRELL as a Dayton-based methamphetamine and heroin/fentanyl supplier.

10. The CI told law enforcement that CANTRELL is currently selling drugs in and around the Dayton, OH area.

**B. The evidence suggests that CANTRELL currently uses the Target Cell Phone to further his drug trafficking business.**

  **i. CANTRELL used the Target Cell Phone to coordinate a controlled purchase with an undercover agent on September 8, 2022.**

11. On September 8, 2022, a law enforcement officer, acting in an undercover capacity (hereinafter, "UC") purchased six ounces of methamphetamine and a half ounce of heroin from CANTRELL for $1,700 in the parking lot of Kohl's department store, located at 10800 Innovation Drive, Miamisburg, Ohio. The UC arranged the drug transaction by contacting CANTRELL at cellular telephone number **(937) 672-0827[2]–the Target Cell Phone**—in recorded text messages. An excerpt from their text message exchange is below:

| | | |
|---|---|---|
| UC | | You on with that fire and ice |
| CANTRELL | | I got it brother. |
| UC | | Ticket on zip of [emoji of fire]? |
| CANTRELL | | To you 200. |
| UC | | Girl? |
| CANTRELL | | My bad brother. |

---

Although no promises have been made to the CI, the CI is motivated to cooperate with law enforcement in hopes of consideration during the prosecution of his/her criminal case. The CI has never provided materially false information.

[2] All of CANTRELL's communications with the UC, including text messages and Facetime video calls, were placed either to or from the **Target Cell Phone**. CANTRELL never used any other phone number to contact the UC.

    **CANTRELL**  [Crying smiley face emoji]

    **CANTRELL**  I got everything you need brother.

12. In my training and experience, "fire" and/or an emoji of fire refers to heroin or fentanyl, and "ice" refers to methamphetamine. "Ticket" is a common slang term for price, and "zip" is a common street term for an ounce of narcotics. Two hundred dollars per ounce is a price consistent with methamphetamine, not heroin, which is much more expensive. The UC clarified what drug CANTRELL was quoting him by asking "Girl?", a common slang word for heroin. CANTRELL replied, "My bad brother," because CANTRELL had provided the UC a price per ounce of methamphetamine, not a price for heroin ("girl").

13. After the text exchange described above, CANTRELL, using the **Target Cell Phone**, placed a Facetime video call[3] to the UC which was audio recorded. During the video call, CANTRELL opened a shoebox and showed the UC a large amount of methamphetamine, heroin, and U.S. currency. CANTRELL told the UC they were "like family now." CANTRELL proceeded to walk around his house showing the UC the inside of his home, to include his girlfriend sleeping in a bed in a bedroom. The UC and CANTRELL then discussed the UC purchasing from CANTRELL six ounces of methamphetamine for $1,000.00 and a half ounce of heroin for $700.00 at the Kohl's parking lot located at 10800 Innovation Drive, Miamisburg, Ohio.

14. On September 8, 2022, at approximately 12:08 p.m., CANTRELL, using the **Target Cell Phone**, placed a Facetime video call to the UC and asked the UC what the UC was driving. The UC and surveillance agents then observed an unknown black male walking in the parking lot directly towards the UC's vehicle. Surveillance agents also observed CANTRELL, who arrived in his tan 2013

---

[3] The UC compared the person on the Facetime video call with the Ohio driver's license photograph of CANTRELL and determined them to be one and the same.

5

Nissan Altima bearing Ohio license plate number JTZ6052 (the "Nissan Altima"), outside of the Kohl's department store in a separate area from the unknown black male. Observing the unknown male approaching the UC's vehicle, the UC moved to another area of the parking lot. The UC noted during the Facetime video call that CANTRELL asked the UC why the UC was moving despite CANTRELL not being in a position to see the UC. In my training and experience, drug traffickers use associates to conduct countersurveillance of drug deals to detect a law enforcement presence. The unknown black male walking towards the UC's vehicle and CANTRELL knowing the UC was moving his vehicle while remaining out of sight is consistent with CANTRELL using an associate to conduct countersurveillance prior to the drug transaction.

15. At approximately 12:10 p.m., while on another Facetime video call with the UC using the **Target Cell Phone**, CANTRELL walked out of Kohl's and got in the UC's vehicle.[4] CANTRELL pulled methamphetamine (total package weight of 169.9 grams) and heroin (total package weight of 15.3 grams) from his pant pocket and placed the drugs in a Taco Bell bag the UC had in the vehicle. The UC pulled the methamphetamine and heroin out of the Taco Bell bag and asked CANTRELL if the weight was going to be right. CANTRELL advised it would be right and the UC handed CANTRELL $1,700 in pre-recorded buy money. CANTRELL then exited the UC's vehicle and walked back inside Kohl's. After a short period of time, surveillance agents saw CANTRELL and a woman, D.S.,[5] walk out of Kohl's and get into the Nissan Altima. Agents noted CANTRELL was carrying a baby carrier. CANTRELL drove the Nissan Altima away.

---

[4] Agents obtained Kohl's security video which shows CANTRELL walking in and out of the department store.

[5] D.S. is the registered owner of the SUBJECT VEHICLE. Surveillance agents compared the woman observed during the September 8, 2022, surveillance with the Ohio driver's license photograph of D.S. and determined them to be one and the same. Because D.S. is not currently the target of a criminal investigation, I am using her initials to protect her privacy.

      ii.     **CANTRELL used the Target Cell Phone to coordinate a controlled purchase with an undercover agent on September 22, 2022.**

16. On September 22, 2022, the UC purchased three and a quarter ounces of methamphetamine and an ounce of heroin from CANTRELL for $1,900 in the parking lot of Applebee's, located at 105 North Springboro Pike, Dayton, Ohio. The UC arranged the drug transaction by contacting the **Target Cell Phone**, used by CANTRELL, in recorded text messages. The UC asked CANTRELL, "You on," and CANTRELL responded, "Yes was checking on you." CANTRELL, using the **Target Cell Phone**, then placed a Facetime video call[6] to the UC. During the video call, the UC and CANTRELL arranged the purchase of one ounce of fentanyl for $1,400.00 and four ounces of methamphetamine for $600 for a total purchase price of $2,000.00. CANTRELL told the UC to meet him at a restaurant near the Dayton Mall at 5:30 P.M.

17. On September 22, 2022, at approximately 5:15 p.m., agents and officers established surveillance near the Dayton Mall. As the UC was driving to the area, CANTRELL, using the **Target Cell Phone**, placed several Facetime video calls to the UC repeatedly asking where the UC was at. In my training and experience, drug dealers will place repeated calls to an individual they are selling drugs to in an effort to detect if law enforcement surveillance is involved. The repeated calls make it difficult for a UC or a CI to coordinate with law enforcement officers conducting surveillance of the drug transaction. During one of the Facetime video calls, CANTRELL directed the UC to the Applebee's restaurant, located at 105 North Springboro Pike, Dayton, Ohio.

18. Surveillance agents observed CANTRELL (driver) and an unidentified female (passenger) in the Nissan Altima, which was parked in the Applebee's parking lot. The UC parked the UC's vehicle next to the Nissan Altima. CANTRELL got out of the Nissan Altima and into the UC's

---

[6] The Facetime video call was not recorded by the UC because a recording device was not available at the time.

vehicle. CANTRELL pulled out a sock and laid it on the center console of the UC's vehicle. The UC pulled plastic baggies containing methamphetamine (total package weight of 91.2 grams) and heroin[7] (total package weight of 29.0 grams) out of the sock, examined it, placed the drugs back in the sock and placed the sock in a cup in the UC vehicle. CANTRELL told the UC the methamphetamine would be "a little light" so the UC could take $100 off the agreed-upon purchase price of $2,000. The UC handed CANTRELL $1,900.00 in pre-recorded buy money. CANTRELL then exited the UC's vehicle and got back into the driver's seat of the Nissan Altima. Agents and officers then surveilled CANTRELL and the unidentified female as they traveled to the Dayton Mall, parked, and entered the mall.

19. Shortly after the transaction on September 22, 2022, CANTRELL, using the **Target Cell Phone**, placed a Facetime video call to the UC. CANTRELL told the UC do drive carefully. The UC then asked CANTRELL if the UC could "step on this," referring to cutting the heroin. CANTRELL told the UC the UC could "hit it one time again," meaning the UC could add cutting agent to the heroin. CANTRELL explained the heroin was very strong. CANTRELL advised the UC to have a drug user with a high tolerance test the heroin to tell the UC how strong the heroin really is.

    **iii. The evidence suggests that CANTRELL continues to use the Target Cell Phone to traffic drugs.**

20. Since the UC's controlled purchase on September 22, 2022, CANTRELL, using the **Target Cell Phone**, has frequently communicated with the UC. For example, CANTRELL, using the **Target Cell Phone**, Facetimed the UC on Friday, September 30, 2022, and again on Sunday, October 2, 2022. During both Facetime calls CANTRELL offered to sell the UC controlled substances, such as methamphetamine and heroin.

---

[7] The heroin supplied by CANTRELL was dyed purple in color.

21. I believe that CANTRELL continues to actively traffic drugs in the greater Dayton, Ohio area, and that he uses the **Target Cell Phone** to contact buyers and arrange drug transactions.

**C. I believe that tracking the Target Cell Phone's location will provide evidence relevant to my investigation into CANTRELL's drug trafficking crimes.**

22. Based on the facts set forth in this affidavit, there is probable cause to believe that CANTRELL uses the **Target Cell Phone** to facilitate his drug trafficking activities in violation of Title 21 of the United States Code. I believe that the information sought by this warrant will help the investigative team monitor the location of the **Target Cell Phone** and determine the location and transportation method of drug shipments as part of the investigation into the Subject Offense**s** conducted by CANTRELL and co-conspirators. Based on my training and experience, I know that cell phones contain vast amounts of personal data; therefore, people usually carry their cell phones with them on their person or store them nearby. For this reason, I believe that by monitoring the location of the **Target Cell Phone**—and thus CANTRELL—agents and officers will be able to identify the primary residence used by CANTRELL and other locations, such as possible stash-houses, used by the drug trafficking organization.

23. In my training and experience, I have learned that Verizon is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records**.** E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. [Cell-site data identifies the

9

"cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

24. Based on my training and experience, I know that Verizon can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on Verizon's network or with such other reference points as may be reasonably available.

25. Based on my training and experience, I know that Verizon can collect cell-site data about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Verizon typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

26. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

27. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

28. I further request that the Court direct Verizon to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Verizon.  I also request that the Court direct Verizon to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Verizon's services, including by initiating a signal to determine the location of the Target Cell Phone on Verizon's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate Verizon for reasonable expenses incurred in furnishing such facilities or assistance.

29. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

30. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Eric J. McIntosh
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on October __4th__, 2022:

Caroline H. Gentry
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number (937) 672-0827, with unknown listed subscriber(s) (the "Target Cell Phone"), whose service provider is Cellco Partnership d/b/a Verizon Wireless ("Verizon"), a wireless telephone service provider headquartered at 80 Washington Valley Road, Bedminster, NJ 07921.

2. Records and information associated with the Target Cell Phone that is within the possession, custody, or control of Verizon, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider**

All information about the location of the Target Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Verizon, Verizon is required to disclose the Location Information to the government. In addition, Verizon must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon's services, including by initiating a signal to determine the location of the Target Cell Phone on Verizon's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Verizon for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**II. Information to Be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of Title 21, U.S.C., §§ 841 and 846, involving Dlaquan CANTRELL and/or other as-yet unidentified subjects.